Michael S. GORBEY, Appellant,

v.

UNITED STATES, Appellee.

Nos. 08–CF–1080, 10–CO–1075.

District of Columbia Court of Appeals.

Argued Oct. 27, 2011.
Decided Sept. 20, 2012.

Preston Burton, with whom Kathleen Orr, Rebecca Mroz, and Lauren B. Mul-doon, Washington, DC, were on the brief, for appellant. Appellant also filed two pro se briefs on his own behalf.

John P. Gidez, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and John M. Cummings, Jennifer A. Kerkhoff, and Mary Ann Snow, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE–RIGSBY and THOMPSON, Associate Judges, and PRYOR, Senior Judge.

THOMPSON, Associate Judge:

On January 18, 2008, at about 1:00 p.m., a woman approached a United States Capitol Police ("USCP") Officer near the intersection of Delaware and D Streets, N.E., and told the officer that a man with a gun had asked her for directions to the United States Supreme Court. From the USCP command center, an officer watched the video feed from surveillance cameras in the area around the U.S. Capitol and saw images of a man walking with a shotgun. As shown on a recording from those cameras, USCP officers stopped and arrested the man—appellant Michael Gorbey—at the intersection of First and D Streets, N.E. At the time he was stopped, appellant had a shotgun in his hand and a sword on his back. Twenty-seven shotgun shells were stored in the bulletproof vest he was wearing, and he also was in possession of hunting knives and a .45–caliber round, which officers found in the backpack he was carrying. Appellant claimed that he was en route to a meeting with Chief Justice John Roberts of the United States Supreme Court.

Minutes after appellant was stopped, USCP officers found a truck illegally

parked nearby and could see in it "heavy gauge wire coming out of [the] radio . . . to the glove compartment . . . [a]nd then . . . coming out of the back of the vehicle," as well as "the stock of a rifle and a home-made bow and arrow." After canine-unit dogs responded to the truck in a manner that suggested that it contained explosives, officers secured the truck and called for the bomb squad to investigate. Bomb squad officers used a remote-control robot to punch through one of the windows of the truck and a tool to "disrupt" and neu-tralize any explosive device that might have been inside the passenger compart-ment. They then conducted a search of the inside of the truck (which was "in some disarray" from the disruptive tool). They found ammunition on the floorboard of the passenger compartment but, during this initial search, they did not find an explo-sive device. USCP officers found the keys to the truck in appellant's pocket and the certificate of title to the truck in the back-pack appellant had been carrying at the time of his arrest.

The USCP officers moved appellant's truck to a secure storage area at 800 North Capitol Street, N.W., and, on Feb-ruary 8, 2008, conducted another search of the passenger compartment, pursuant to a search warrant. After moving the passen-ger seat forward, officers found an object that one of the officers described as a "home-made bomb." The object (hereaf-ter referred to as the "device") consisted of "a metal can spray painted red" and "a clear bottle filled with what looked like lead pellets," and "everything was duct taped." After the bomb squad used a tool to "disrupt" the device, officers completed a search of the passenger compartment and cab of the truck. They recovered a "large amount" of black powder; fire-crackers; lighters; primer or percussion caps; shotgun shells and shotgun car-tridges; 550 rounds of long·rifle ammuni-tion; 200 rounds of other ammunition of various calibers; a rifle scope; and the (disrupted) components of the device (i.e., the metal can, duct tape, black powder, metal pellets, and glass fragments).

Appellant was charged and subsequently convicted, on May 16, 2008, of fourteen separate offenses in connection with the events described above: unlawful posses-sion of a firearm by a convicted felon; two counts of carrying a dangerous weapon outside the home or business (shotgun and sword) ("CDW"); possession of an unreg-istered firearm ("UF"); eight counts of unlawful possession of ammunition ("UA"); manufacture, transfer, use, possession, or transportation of explosives for an unlaw-ful purpose;[1] and attempted manufacture or possession of a weapon of mass destruc-tion ("WMD").[2] As described more fully below, appellant insisted on representing himself at trial and did so, assisted by counsel from the Public Defender Service (PDS) who served as his standby counsel or attorney-advisor.[3] After sentencing, appellant made filings in support of a *pro se* motion to vacate or set aside his convic-tion pursuant to D.C.Code § 23–110 (2001), and appellate counsel appointed by

1. *See* D.C.Code § 22–4515a (b) (2001) (the "explosive device statute").

2. *See* D.C.Code § 22–3154(b) (2002) (the "WMD statute").

3. *See Ali v. United States*, 581 A.2d 368, 379 (D.C.1990) ("Frequently, . . . a defendant re-ceives the assistance of attorneys whom courts have called 'standby' counsel, 'co-counsel,' 'back-up counsel,' or 'advisory' counsel. The Supreme Court has held that while a defendant does not have a constitu-tional right to such 'hybrid' representation, the trial court may permit this arrangement in its own discretion.") (citing *McKaskle v. Wiggins*, 465 U.S. 168, 183, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984)).

this court supplemented that motion, which the trial court denied without a hearing on August 18, 2010.

Before us now are consolidated appeals: appellant's direct appeal from each of his convictions and his appeal from the trial court's denial of his § 23–110 motion. The issues on appeal have been presented in opening and reply briefs filed by counsel, and in opening and reply briefs filed by appellant *pro se*.[4] The briefs raise a battery of claims. Through counsel, appellant principally argues that his convictions should be overturned because the trial court "failed to order an evaluation of his competency to stand trial, his competency to proceed *pro se,* and his competency to waive his right to present the insanity defense despite warnings of incompetence." The briefs also argue that the evidence was not sufficient to support the convictions for CDW, possession of an explosive device, and attempted manufacture or possession of a WMD; that the WMD statute is unconstitutionally vague; that appellant was deprived of an impartial jury; that PDS counsel deprived appellant of effective assistance of counsel by failing "to pursue mental health-related issues" and by failing to "secure a rebuttal [expert] witness" for the defense to address the WMD and explosive device charges; and that several of appellant's convictions merge. Appellant's *pro se* briefs also present several additional claims, which we

identify and address summarily at the end of this opinion.

For the reasons set out below, we reject the claim—advanced by counsel, but not by appellant in his *pro se* briefs—that the trial court abused its discretion by not ordering an evaluation of appellant's competence to stand trial and by permitting appellant to represent himself at trial. Our close review of the record persuades us that nothing presented to the trial court—neither the "aggregate of [relevant] indicia" nor any factor "stand[ing] alone," *Drope v. Missouri,* 420 U.S. 162, 180, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (internal quotation marks and citations omitted)— raised a substantial question about appellant's competence. We also conclude, however, that by the time the matter proceeded to sentencing, sufficient "red flags" had been raised that the trial court was required to conduct an inquiry (a so-called *Frendak* inquiry[5]) to determine whether appellant intelligently, knowingly and voluntarily waived a (possible) insanity defense. Accordingly, we remand for that inquiry.

We reject appellant's other challenges; however, we conclude that several of appellant's convictions merge, and we direct the trial court to vacate the affected convictions, including the conviction for possession of the .45 caliber round. Accord-

---

**4.** Appellant took the position in the trial court and in this court that he did not wish appointed counsel, Preston Burton, to represent him in connection with his § 23–110 motion or on appeal. In a September 23, 2010, order, this court denied counsel's motion to withdraw and directed appellant to cooperate with counsel, but, in a subsequent order, ruled that appellant would be permitted to file a supplemental *pro se* brief "addressing any additional issues that he wants the court to consider."

**5.** *Frendak v. United States,* 408 A.2d 364, 380 (D.C.1979) ("[W]henever the evidence sug-

gests a substantial question of the defendant's sanity at the time of the crime, the trial judge must conduct an inquiry designed to assure that the defendant has been fully informed of the alternatives available, comprehends the consequences of failing to assert the defense, and freely chooses to raise or waive the defense."); *see also Phenis v. United States,* 909 A.2d 138, 154 (D.C.2006) (noting that an inquiry into whether the defendant "can intelligently and voluntarily waive the insanity defense and has done so" is "now commonly called a '*Frendak* inquiry' ").

ingly, if the trial court determines upon remand that appellant has validly waived an insanity defense, his convictions (other than those that merge) will stand.[6] In its discretion, the trial court may re-sentence appellant if it determines that to be the appropriate course in light of information adduced upon remand.

## I. Whether the Trial Court Abused Its Discretion in Failing to Order an Evaluation of Appellant's Competence to Stand Trial, His Capacity to Represent Himself, and His Capacity to Waive An Insanity Defense

### A. The Trial Proceedings

#### 1. Appellant's Competence to Stand Trial

■ Due process "prohibits the criminal prosecution of a defendant who is not competent to stand trial." *Medina v. California*, 505 U.S. 437, 439, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992); *see also Drope*, 420 U.S. at 171, 95 S.Ct. 896 ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."). The test for determining competency to stand trial is whether a defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as a factual understanding of the proceedings against him." *Higgenbottom v. United States*, 923 A.2d 891, 897 (D.C.2007) (quoting *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)) (internal quotation marks omitted). "Where there is evidence raising a substantial doubt as to a defendant's competency to stand trial, the trial judge is under a constitutional duty to order a hearing sua sponte." *Phenis*, 909 A.2d at 152 (quoting *Holmes v. United States*, 407 A.2d 705, 706 (D.C.1979)) (internal quotation marks omitted); *see also Clyburn v. United States*, 381 A.2d 260, 263 (D.C.1977) (A trial court is "obligated to make or compel inquiry if it is in receipt of information which raises a bona fide doubt of defendant's competence."). In determining whether a competency hearing is warranted, factors such as a defendant's irrational behavior, demeanor at trial, prior medical opinions, evidence of mental illness, and representations by defense counsel are all relevant; courts must "examine the totality of the circumstances: all evidence should be considered together, no single factor stands alone." *Gilbert v. Mullin*, 302 F.3d 1166, 1179 (10th Cir. 2002) (internal quotation marks omitted).

■ "There are ... no fixed or immutable signs which invariably indicate the need for [the trial court to make] further inquiry to determine [the defendant's] fitness to proceed[.]" *Drope*, 420 U.S. at 180, 95 S.Ct. 896. Further, " '[n]ot every manifestation of mental illness demonstrates incompetence to stand trial[.]' " *Eddmonds v. Peters*, 93 F.3d 1307, 1314 (7th Cir.1996) (quoting *United States ex rel. Foster v. DeRobertis*, 741 F.2d 1007, 1012 (7th Cir.1984)). For example, even where it appears that a defendant has a "delusional belief of government persecution," an evaluation of whether he was competent to stand trial must turn on a review of "the substance of [his] pro se filing[s]" and statements in court, whether he was "following the testimony," and whether he "was able to make relevant

---

**6.** *See Phenis*, 909 A.2d at 159–60; *Briggs v. United States*, 525 A.2d 583, 594–95 (D.C. 1987).

suggestions to his attorney." *United States v. Ghane,* 593 F.3d 775, 781, 782–83 (8th Cir.2010).[7]

 Where a claim is made that the trial court erred by failing sua sponte to raise the issue of a defendant's competence to stand trial, "[o]ur review ... is limited to an examination of whether the trial court abused its discretion, the exercise of which we will not lightly disturb." *Clyburn,* 381 A.2d at 261, 262–63; *see also Phenis,* 909 A.2d at 152. We accord great deference to the trial court's inferences from its personal observations of, and conversations with, the defendant. *Howard v. United States,* 954 A.2d 415, 422 (D.C. 2008).

Through counsel, appellant argues that the trial court "ignored a series of red flags" that went up during the pre-trial and trial proceedings and that "signal[ed] a need to examine appellant's competen-

cy." We address each of these "red flags" in detail, explaining why we conclude that, whether considered separately or all together, they did not "inescapably call into question appellant's competence to stand trial[.]" *Clyburn,* 381 A.2d at 263.[8]

*a. Appellant's Conduct and Appearance at the Time of His Arrest*

 The first claimed "red flag" is appellant's "conduct and appearance at the time of his arrest," including "his possession of an array of weaponry" and his claim that he had an appointment with the Chief Justice. We do not agree that these facts raised a substantial doubt about appellant's competency, because they did not signal that appellant might have lacked a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" or that he lacked a "rational or factual understanding of the proceedings against him." [9] *Higgenbot-*

---

**7.** *See also United States v. Lambros,* 65 F.3d 698, 701–02 (8th Cir.1995) (concluding that defendant's pro se filings and lucid explanations in court supported the district court's conclusion that the defendant was competent to stand trial, notwithstanding defendant's delusions that the government controlled his thoughts through an electronic implant); *Bundy v. Dugger,* 850 F.2d 1402, 1409–10 (11th Cir.1988) (affirming district court determination that even if defendant Bundy "otherwise suffered from bipolar disorder, the disorder was not manifesting itself as to affect his competence to stand trial[,]" and noting in particular that Bundy had "delivered a cogent, well-reasoned argument [that] focused on the effect of pretrial publicity on the jury," and that videotapes taken while the jury was deliberating showed Bundy "describ[ing] his displeasure at one of the trial judge's instructions, evaluat[ing] some of the evidence against him, and criticiz[ing] the state's closing argument for referring to facts not in evidence").

**8.** The last of the "red flags" that the briefs cite is a "PDS report raising mental health issues," which was submitted to the trial

court for sentencing consideration. We discuss it in section I.B, *infra.*

**9.** We also note that, at appellant's probable cause hearing before Magistrate Judge Andrea Harnett on January 23, 2008, appellant's then-assigned PDS counsel, Elizabeth Mullin, asked USCP Detective Joseph DePalma, who interacted with appellant on the scene shortly after his arrest, whether appellant appeared to be "having maybe a reaction to a mental illness" on the day of his arrest. DePalma's response was that the "things that [appellant] ... talked] about" at that time were "rational." Further, the government presented testimony by one of appellant's acquaintances (Robert Neff) that on the morning of January 18, 2008, appellant used his cell phone to call "a court in D.C." and that Neff heard appellant mention something about lawsuits, ask about a judge, and then tell the party on the other end of the call, "you tell that judge I will see him today." Thus, there was evidence that appellant was indeed on his way to attempt to see a judicial officer when he was stopped by police. His conduct was bizarre, and he undoubtedly embellished the truth in stating that he had an appointment with the

*tom,* 923 A.2d at 897 (quoting *Dusky,* 362 U.S. at 402, 80 S.Ct. 788) (internal quotation marks omitted). Courts have held repeatedly that bizarre and irrational behavior cannot be "equated with mental incompetence to stand trial." *Medina v. Singletary,* 59 F.3d 1095, 1107 (11th Cir. 1995).[10] Competency "is not the same as whether the defendant has an insanity or diminished capacity defense on the merits or whether his ideas about how to live or what to believe are common in the community or seem sensible to others. Rather the competency insisted on by the courts is a functional concept focusing on the defendant's part in the trial." *Robidoux v. O'Brien,* 643 F.3d 334, 339 (1st Cir.2011). As we go on to discuss, we are satisfied that "defendant's part in the trial[,]" *id.,* did not raise substantial doubt about his competency.

### b. Appellant's Conspiracy Theory

██ The second "red flag" cited in the briefs consists of appellant's "insistence that his defense depended on presenting evidence that the FBI, CIA and Capitol Police (and later the trial court and the U.S. Attorney's Office) conspired against him" and his "attempts to introduce evidence of various civil lawsuits [he had] filed against these entities as proof of these conspiracies." The record—including numerous statements by appellant in open court and in some of his pro se filings—certainly demonstrates that appel-

lant operated under the belief that there was a widespread government conspiracy directed at him. Appellant told the court repeatedly that while he had no knowledge of most of the items he was charged with possessing, "[t]he police conspired in saying that [he] did." He told the court that "this very prosecution office was involved, [and] this very FBI was involved" in the conspiracy, that the alleged WMD was "planted upon me 21 days after [the truck] was held in police storage," and that officers had "every reason to lie and say" that a bomb was found in the truck.[11] Appellant also filed a motion for recusal in which he asserted that the court "is an officer of the U.S. government which is involved in a vast legal conspiracy against the defendant[.]" In addition, he asserted that he was carrying shotgun shells on the day of his arrest for the purpose of showing the court evidence of what had been "used in attempts of murder against me." He told the jury in his opening statement that he intended to show how "they conspire and lie to cover up other lies" and "their motive." He told the court that even the pedestrian who first reported having seen a man with a shotgun in search of the Supreme Court was a part of the conspiracy against him. Finally, in his closing argument, appellant told the jury that "they" had "created evidence against me" and "planted evidence against me."

Nevertheless, in light of the entire record, we are not persuaded that appellant's

Chief Justice, but the record evidence about appellant's behavior at the time of his arrest is that he appeared to be oriented to where he was and what was going on around him.

**10.** *See also, e.g., United States v. O'Neal,* 969 F.2d 512, 514 (7th Cir.1992) ("[T]he assertions that the crime, alone, was so bizarre in nature as to demand further investigation of the defendant's competency to stand trial must yield to the reality that in that sense all crime is bizarre[.]"); *Clyburn,* 381 A.2d at 263 ("The brutality of a crime does not, with-

out more, reflect on its perpetrator's ability to assist counsel and to understand the nature of the proceedings against him.").

**11.** The trial court repeatedly shut down appellant's efforts to ask law enforcement witnesses whether they had reviewed paperwork found in the truck that pertained to lawsuits he had filed against the federal government, and whether that information had biased the witnesses against him.

obvious conspiracy beliefs should have given the trial court "substantial doubt"[12] about whether appellant had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and a rational and factual understanding of the proceedings against him. To the contrary, the trial court could see that appellant's communications with his standby counsel enabled counsel to explain cogently why appellant should be able to elicit some of the conspiracy-theory-related evidence appellant sought to present. For example, standby counsel Eugene Ohm[13] told the court that:

> Mr. Gorbey's assertion is that his defense isn't the conspiracy. His defense is, essentially, plant and fabrication. It's the motive to fabricate that comes through his prior legal battles with members of the federal government.... [W]e understand the Court's ruling that conspiracy is not a legal defense, but it certainly gives motive, or it provides the background and the context for Mr. Gorbey's allegation ... that the officers are fabricating, and there are allegations of planting evidence.

Earlier in the proceedings, standby counsel Jason Tulley had told the court *ex parte* that appellant had filed "lawsuits against certain of the organizations that are involved in investigating the case" and that appellant might proceed on a bias theory, i.e., that "there was a bias for half of the folks who were involved." Tulley further explained to the court that when USCP bomb squad officers conducted a search of the truck before it was impounded, they found no destructive device, but that the truck did contain documents pertaining to appellant's pending lawsuit against the FBI; and that three weeks later, when investigators did an additional search, they found a destructive device, which, counsel told the court, "really does provide a solid legal foundation for some line" of bias inquiry.[14] Standby counsel Ohm likewise argued that appellant "should be provided the opportunity to present a defense where he explains why he believes the Capitol Police officers knew who he is."[15] Even for their part, the prosecutors treated appellant's bias theory as coherent enough that they inquired of each government law enforcement witness whether the witness had ever met appellant or heard his name before January 18, 2008.

Just as important, although appellant sought to employ a defense related to his conspiracy theory, he did not forgo other lines of defense. He made numerous oral motions and filed several handwritten motions, including a pre-trial motion to suppress, many portions (if not the entirety)

12. *Phenis*, 909 A.2d at 152.

13. On April 21, 2008, PDS lawyer Eugene Ohm entered his appearance to replace Jason Tulley as standby counsel.

14. Standby counsel Ohm also explained to the court that there had been an internal USCP investigation focusing on the search discrepancies. One of the prosecutors confirmed that a USCP officer had been demoted as a result of that investigation, for "his team [having] missed this device."

15. Appellant, too, was able to explain to the court why he thought the USCP officers knew who he was before arresting him (reasoning that the officers promptly charged him with being a felon-in-possession and thus obviously knew of his background before they stopped and arrested him). One of the prosecutors explained that "I think part of the problem is Mr. Gorbey may not be as familiar as the rest of us are with the process that goes on. The officers conduct a background check. Once they knew who Mr. Gorbey was, they had an NCIC check, which indicated he had these felony convictions. Therefore, they include that as one of the possible charges." Although appellant's theory was misinformed, it was not irrational.

of which had at least a colorable legal foundation and had nothing to do with his belief about a government conspiracy. He also filed a handwritten motion for a change of venue and explained to the court his concern that certain television news channels had "stressed ... me being guilty of the charges" rather than reporting the "allegations" against him.[16] In addition, he filed a motion for independent DNA testing, explaining to the court that the paperwork he had received in discovery indicated that recovered items had been sent to the FBI laboratory for testing for genetic materials.[17] Appellant also asked the court to suppress his statement about an appointment at the Supreme Court, and he moved for a mistrial after his statement was introduced, citing the prejudicial effect of evidence about where he was going at the time of his arrest and the lack of probative value, given that the government had declined to charge him with threatening the Chief Justice. In addition, appellant challenged the warrantless search of his backpack and the warrantless initial search of the truck. "The fact that [appellant] was able to file so many different *pro se* motions indicates ... that he had a very rational understanding of the proceedings against him[,]" and it gave the trial court a strong basis for regarding him as competent, since "[o]ne incompetent to understand the nature of the criminal court process would likely be unable to file the type of legal pleadings that [he] filed *pro se.*" *Adams v. State,* 509 N.E.2d 812, 814–15 (Ind.1987).

Further, when appellant cross-examined Special Agent Mark Crawford during the pre-trial hearing on the motion to suppress items found in the truck, he asked questions focusing on whether the canines' display of "interest" in a location is always indicative of explosives—questions that were directed at whether the dogs' response gave officers reason to believe that there were exigent circumstances that justified searching the truck without a warrant. Appellant also challenged whether the alleged explosive device recovered from his truck qualified as a "device" for purposes of the WMD and explosive device statutes, and he questioned his expert witnesses on the same issue. He asked the court to permit "a report of our own [to be] done on the device ... by an independent technician" and to permit testing to determine whether some of the black powder found in the truck came from shotgun shells which had been disrupted by the bomb squad's remote-control tool, rather than from the alleged explosive device. During trial, appellant objected to the government's submitting into evidence a final crime scene report that was different from the draft report that had been shared with the defense at an earlier point. He questioned an evidence technician about whether there were identifiable fingerprints on the shotgun. He argued to the court that he innocently possessed the .45 caliber ammunition found in his backpack, prompting the prosecutor to brief the elements of an innocent-possession defense.[18]

16. Appellant also posed questions to prospective jurors about how they felt about the possession of firearms, their connections with law enforcement organizations, their familiarity with locations involved in the case, their prior jury service, and whether they had read about the case.

17. The matter was resolved after the prosecutor said that the government would not present any DNA results as part of its evidence, with appellant telling the court that he would not press the issue further since his concern had been with "test results that they intended to enter."

18. *See Bieder v. United States,* 707 A.2d 781, 783 (D.C.1998) ("[T]o assert the defense of innocent possession, an accused must show not only an absence of criminal purpose but

Many more examples could be cited, but the point, in short, is that during every phase of the pre-trial and trial proceedings, and notwithstanding his focus on a government conspiracy, appellant was attentive to the evidence, showed that he understood the elements of the offenses with which he was charged, and pursued an array of defensive strategies. Upon this record, we are satisfied that appellant's belief that he was the victim of a massive conspiracy did not give the court a substantial reason to think that he lacked an understanding of the charges against him or an ability to assist in his defense.

### c. Appellant's Relationship with His PDS Counsel

 The briefs assert that the third "red flag" that should have caused the trial court to question appellant's competence was his "inability to consult with his attorneys, as demonstrated by his cycling through two court-appointed attorneys before demanding to represent himself." This assertion exaggerates and mischaracterizes the record.

The record does not support a conclusion that it was appellant's inability to work with counsel that led to his "cycling through" his trial attorneys. PDS lawyer Larry Coopers represented appellant at his initial (and very brief) court appearance on January 19, 2008. The record reveals nothing about why Coopers made no further appearances on appellant's behalf.[19] PDS lawyer Elizabeth Mullin appeared on appellant's behalf at a hearing on January 23, 2008. She told the court at the end of that hearing that appellant desired to represent himself. Appellant later told the court that he discharged Mullin because, after a month and a half of representing him, she "didn't even give me the first document to show me what I was locked up for." This was consistent with what Mullin told the court on February 4, 2008—that appellant was "deeply dissatisfied" with her representation because he had requested that she send him some materials, and appellant "didn't think that [what she sent] were the things that he requested." Mullin also told the court that she and appellant "got off on the wrong foot" because, at the preliminary hearing, she had declined to ask some of the questions appellant wanted asked. Ohm told the court only *post-trial* that appellant's not getting along with Mullin resulted from her "identif[ying] this as a mental health case[.]"

Whatever the full explanation for Mullin's departure as counsel, by February 14, 2008, Mullin had been replaced by PDS lawyer and standby counsel Jason Tulley. Nothing in the record indicates that appellant had difficulty consulting with Tulley. To the contrary, during an April 15, 2008, hearing, appellant agreed that it was "fair to say" that he had a "good working relationship" with standby counsel Tulley. The court later noted that appellant had indicated that he and Tulley had "worked

also that his possession was excused and justified as stemming from an affirmative effort to aid and enhance social policy underlying law enforcement.") (internal quotation marks and ellipses omitted). Both in the trial court and in this appeal, appellant's argument is that he "possessed [the] 45 shell and was in rout[e] to a meeting with the D.C. FBI at the U.S. Supreme Court that Gorbey was informed by the FBI that they had arranged." We reject appellant's argument that the trial court erred

in ruling that the record did not support that defense. Suffice it to say that appellant introduced no evidence that the FBI had arranged a meeting with him.

19. At a hearing on July 11, 2008, appellant stated that Coopers "hopped on on my first hearing ... and then he removed himself. I had nothing to do with it. They appointed Ms. Mullin[ ] afterwards."

out" any "differences" they had. Tulley advised the court, however, that he would be in trial in other matters and thereafter would be taking paternity leave. Consequently, at a hearing on April 21, 2009, Ohm entered his appearance, and he thereafter served as appellant's standby counsel.

From all that the record shows, appellant thereafter cooperated and regularly consulted with Ohm throughout the pretrial and trial proceedings. The briefs correctly note that appellant expressed some distrust of attorneys; when the trial court asked appellant why he wished to represent himself, he replied, "Technically, my case pertains to several attorney associations, and also I feel that the only way that I will receive a proper defense is if I do so myself." However, the record also makes clear that appellant relied on and put his trust in standby counsel Ohm. For example, appellant agreed that it would be acceptable for the government to provide discovery directly to Ohm, who could bring the discovery to appellant to ensure that he received it while in jail. Appellant also told the court that he had copies of his proposed trial exhibits for standby counsel, which counsel could provide to the government.

Further, the transcript from the suppression hearing contains multiple examples of appellant's consultation with standby counsel. For example, at one point, appellant explained to the court why his objection to an item of evidence had been delayed, saying, "Your Honor, I should have, while [the prosecutor] was referring to the item, raised an objection. I was speaking with [standby counsel] here in concern of the item." During the cross-examination of Special Agent Crawford,

appellant said, "How about I just let [standby counsel] handle the statement part [i.e., the argument regarding whether appellant's statement about an appointment with the Chief Justice was admissible], and then I'll go back to questioning the witness if that's possible." At the end of the cross-examination, appellant stated that he had "no further questions, unless [standby counsel] has any questions on my behalf that he'd like to ask."

In addition, appellant and Ohm coordinated their efforts during jury selection [20] and their efforts at trial strategy. During the proceedings on April 25, 2008, the trial court called a recess so that appellant and standby counsel could talk in private and discuss strategy on the introduction of an expert witness. On May 1, 2008, Ohm told the court that he would consult with appellant about the effect of introducing evidence during the government's case-in-chief. During a break in the testimony of one of the government's USCP witnesses, appellant told the court, "Yes, it might be a little better if Mr. Ohm [presented the defense's Rule 16 objection], Your Honor"; Ohm thereafter made the argument. Indeed, although insisting throughout the proceedings that he wished to represent himself, appellant frequently yielded to Ohm to present highly technical arguments (e.g., regarding the exclusion of other-crimes evidence, the innocent-possession defense, and whether the government's explosives expert, Daniel Hickey, was qualified to opine on the device's potential to inflict serious bodily injury) and to conduct the voir dire and cross-examination of Hickey (showing that appellant recognized the seriousness of the WMD charge). At the close of the government's case, appellant also told the court that he

---

20. At one point, Ohm explained to the court that "Mr. Gorbey was under the impression that I was exercising the peremptory strike, and [that] I told him not to, so if I could renew my motion to strike the first juror, 529."

wanted Ohm to argue the motion for judgment of acquittal.

Not only is the record replete with evidence that appellant cooperated with his standby counsel, but also the court recognized on the record that appellant and Ohm worked well together. On April 22, 2008, the court remarked that "[y]ou [i.e., appellant] and Mr. Ohm seem to have a good working relationship, and that's fine. I'm glad to see that." In addition, after the jury rendered its verdicts, the court appointed Ohm to represent appellant during the post-trial proceedings, *at appellant's request.* In light of all the foregoing, we cannot say that appellant's having "cycled through" a number of PDS lawyers should have caused the court to inquire into appellant's competency.[21]

### d. Appellant's Testimony About Gad Cap

 The next "red flag" on which the briefs focus is appellant's testimony that a friend named "Gad Cap" was the man seen in the USCP surveillance video. Appellant testified that after he made a phone call to the Supreme Court on January 18, 2008, and verified that he "was to meet some people" concerning "legal matters," he left Mount Vernon headed for the District of Columbia with Gad Cap, a friend who bore a strong resemblance to him.[22] According to appellant, Gad Cap drove while appellant slept, eventually parked the car on D Street in the District, and then awakened

appellant. Appellant left the vehicle with "a backpack full of legal documents, a walking stick, [and a] cell phone," and proceeded toward the Supreme Court. The two men walked together until they got to First Street, where they separated. The police then "confronted [appellant] and arrested [him]" and, before Gad Cap "could get back to the truck, other police [were] at the vehicle." Gad Cap "called someone to come and get him," and he left the District. Appellant testified that he was not the man shown in the surveillance video walking with a gun (implying that the man was Gad Cap), that the video of his arrest was not a true and accurate depiction of what happened that day, that the video had been "altered" to show him with "a lot of things that weren't with [him]," and that he had never seen the device found in the truck.

We cannot say that the testimony must have evinced to the trial court that appellant had "a fundamental misunderstanding of the 'nature and object of the proceedings.'" *United States v. Arenburg,* 605 F.3d 164, 171 (2d Cir.2010) (quoting *Drope,* 420 U.S. at 171, 95 S.Ct. 896); *see also United States v. Reed,* 668 F.3d 978, 987 (8th Cir.2012) ("Reed's lengthy colloquies with the court demonstrated that he was committed to pursuing untenable defenses, but not that he lacked the mental competence to stand trial and to knowingly waive his right to counsel."). We have no doubt that appellant's testimony caused the trial court (and the jury) to conclude that appel-

---

21. *Cf. Phenis,* 909 A.2d at 152–53 (reasoning that where the court heard defense counsel say that appellant was cooperative and also observed appellant interact with counsel in the courtroom, "[a]ppellant's behavior during trial, although bizarre ... was not such that it must have raised a 'substantial doubt' in the trial court's mind as to his ability to rationally consult with his attorney and to understand the nature of the trial proceedings[ ]").

22. On cross examination, appellant testified that he had known "Gad Cap" for six years and that Gad Cap lived in Mount Vernon, Virginia. Although he said he did not know Gad Cap's address, appellant explained how to get to Gad Cap's house from the Mount Vernon Parkway. In rebuttal, USCP Agent Crawford testified about his futile efforts, based on appellant's information, to locate anyone named "Gad Cap," either in Mount Vernon or elsewhere in the nation.

lant was dissembling, but we do not agree that the testimony signaled that appellant might be incompetent to stand trial. It showed, instead, that appellant understood the charges against him, and, in particular, understood that he needed to avoid a finding that he had control over the truck and possessed a shotgun on January 18, 2008, even though the jury saw a video that seemed to show just the opposite. Moreover, even if appellant developed his testimony about Gad Cap without communicating with his standby counsel or contrary to his standby counsel's advice, "the test for competency hinges solely upon whether [he had] a 'sufficient present *ability*'" to consult with his attorney, not on whether he actually did so at all points during the trial. *Howard,* 954 A.2d at 419 (quoting *Phenis,* 909 A.2d at 152).

### e. Comments to the Court by PDS Counsel and Prosecutors

 The final "red flag" that the briefs argue should have caused the trial court to question appellant's competence to stand trial relates to "the concerns that PDS lawyers and the government expressed about appellant's mental health." Again, we think the argument overstates the record. We discuss the various statements that the briefs cite.

On January 23, 2008, at a preliminary hearing before Magistrate Judge Harnett, Mullin responded to an objection to a question she had posed to the witness about the "papers or documents recovered" from the truck. Mullin told the

court that she had a good faith basis to believe that the paperwork "would undermine the Government's claim of dangerousness" and "indicate maybe Mr. Gorbey's mental state at the time." Mullin's reference to appellant's "mental state" did not clearly apprise the court of any concern about appellant's competency.[23] We note that during trial, the prosecutor used a similar phrase—appellant's "state of mind"—to refer to appellant's desire to present witnesses who could testify regarding his focus on his litigation against the government, i.e., his "state of mind relative to the litigation he has been involved in over the years." Mullin's reference to the documents "undermin[ing] the Government's claim of dangerousness" suggests that she, too, had in mind appellant's focus on his lawsuits, and the documents relating to them that were stored in the truck, when she referred to appellant's "mental state" on the day of his arrest.

Later in the January 23, 2008, proceeding, Magistrate Judge Harnett asked Mullin during an ex parte bench conference whether she "want[ed] to tell me anything about [appellant's] mental health situation[.]" Mullin responded "not at this time" and said, "my client doesn't want to pursue that route." However, she advised the court that it "could order a forensic. I just can't ask for it."[24] Judge Harnett declined to order a forensic, stating that she didn't "know enough to think that's appropriate[.]" We agree with Judge Harnett's assessment, as Mullin provided the court with no facts to suggest that

---

**23.** We recognize that, in his August 18, 2010, order denying appellant's § 23–110 motion, the trial judge (the Honorable Gregory Jackson) stated that Mullin "raised questions [before Magistrate Judge Harnett] about [appellant's] competency" but "provided no facts to establish a basis for the conclusion that [appellant] was incompetent." However, presumably, Judge Jackson made that statement upon reviewing a transcript of the January 23, 2008, proceedings before Magistrate Judge Harnett. We, too, have reviewed that transcript, and we are not bound by Judge Jackson's interpretation of Mullin's statement.

**24.** Mullin also said, "[W]e're not asking for a forensic."

appellant lacked the ability to consult with counsel or to understand the proceedings.

At a status hearing on February 4, 2008, before the trial judge, Mullin told the court that "this is a case where normally I would have [the defendant] evaluated and proceed that way, but he won't permit me to and I think that maybe if he's got a lawyer that he trusts we might be able to go that route." This comment, about what counsel would "normally" do, was not sufficiently specific to appellant to apprise the court that counsel had a concern about his competence to stand trial.

The next mention in the record of appellant's mental status was in the government's March 12, 2008, discovery letter to standby counsel Tulley, which stated that "[the government] will not extend a plea offer to your client without learning more about your client's current mental state. Accordingly, your client will have to consent to a psychological evaluation, and disclosure to the government of the results of that evaluation, before the government will extend a plea offer in this case." The prosecutor referred to this letter during trial on May 13, 2008, telling the court during a bench conference that "one of the reasons the government had asked for a screening earlier" was that "[t]here's a sense of self-importance that Mr. Gorbey believes that he was the focus of attention, and as the Court and the jury has heard in every single witness, nobody knew who Mr. Gorbey was prior to January 18, 2008." [25] Notably, however, during the very same colloquy, the prosecutor told the court that "[t]he defendant is competent."

Especially in light of that comment, we do not take the request for information contained in the government's March 12, 2008, letter as evidencing "concern" that appellant was incompetent.

The lawyers' next reference during trial to appellant's mental health was the prosecutor's request that the court give the jury an instruction "regarding [the] defendant's failure to raise an insanity defense." [26] After the trial court declined "to give that [instruction]" (the record does not indicate precisely what instruction the prosecutor had in mind), the prosecutor said:

I would ask the court to reconsider, based on the defendant's conduct today. I think what concerns me, as I stated in the motion, this is the elephant in the room, Your Honor, particularly given some of the outbursts by Mr. Gorbey, his statements about conspiracy, death threats, sending coded messages to the government with his seal. And again, I know every observer I talk to asked me the same thing, whether from the defense bar or the prosecutor's office about his mental state.

The trial court took the prosecutor's comment as "concern[ ] that the jurors might question Mr. Gorbey's mental state and use that as a basis for nullifying," not as concern that appellant lacked a rational understanding of the proceedings. The court's response to the comment was that jurors "might just as well go the other way and say Mr. Gorbey's outbursts are deliberate, willful and intentional, and he knows what he is doing and decide based on

---

25. The prosecutor's comment did not refer to the March 12, 2008, discovery letter, but our review of the record indicates (and the briefs suggest) that the letter was the only communication by which the government had "asked for a screening earlier."

26. The prosecutor had also remarked to the court on April 30, 2008, that the conspiracy "exists only in Mr. Gorbey's mind." For the reasons already discussed, we do not regard this reference to appellant's conspiracy beliefs as a comment that called into question appellant's competence to stand trial.

that."[27] It seems clear that the trial judge himself thought appellant "knew what he was doing"; indeed, Judge Jackson told appellant just that, saying, "You're a very bright man. You know exactly what you're doing. You know exactly what you're doing when you go into these areas that I have forbidden you to talk about and to ask witnesses about." Because we must accord great deference to the inference the trial court drew from its observations and personal interaction with appellant, *see Howard*, 954 A.2d at 422, we cannot say that the trial court's assessment was in error. *Cf. Wallace v. United States*, 936 A.2d 757, 774 (D.C.2007) ("[W]e accord great deference to [the trial judge's] personal observations of and conversations with appellant, which informed [his] judgment that appellant was competent[.]").

The final comments to which appellant's briefs point as a "red flag" occurred during an exchange after appellant sought to introduce into evidence documents that he claimed would prove that, prior to his arrest, he had contacted law enforcement officers about shotgun shells that had been used in attempts to murder him. The prosecutor remarked:

> [I]t's this type of mindset and these types of statements and just paranoia that has caused the government in the past to request a forensic. I think this is further evidence that continues to adversely influence Mr. Gorbey's thinking at trial despite the Court's numerous rulings. And just for the record, I would renew the government's request for a forensic.

The court responded, "I don't think I have a legitimate basis to order a forensic at this time." This exchange, which was the only instance in which any of the lawyers asked the court to order a mental health evaluation, would give us some pause were it not for the fact that the prosecutor told the court at a later point in the trial that "[t]he defendant is competent." That comment suggests that, in the earlier request for a "forensic," the prosecutor was seeking to protect the record, not expressing concern about appellant's competency.

 In light of all the foregoing, we cannot conclude that the trial court abused its discretion in failing to order a competency evaluation during trial. It is not just that the evidence that appellant was fully attuned to what was going on during the trial and pre-trial proceedings, and that he cooperated with his standby counsel and assisted in his defense, outweighed evidence of appellant's possible incompetence. Rather, we conclude, the trial court really was not presented with any substantial evidence of incompetence. We are satisfied that the briefs—in pointing to "red flags" of incompetence—either mischaracterize the information that was before the court or overlook how appellant's statements, testimony, arguments, and strategic manner of working with his standby counsel signaled his competence to stand trial, rather than the opposite. The record fully supports the trial court's statement (in its ruling on appellant's § 23–110 motion) that appellant "remained engaged in his defense throughout the trial, consulted with advisory counsel, and displayed a clear understanding of the proceedings

---

**27.** We note that although the prosecutor referred at this point to appellant's "outbursts," the court stated, in its order denying appellant's § 23–110 motion, that appellant "did not exhibit violent or irrational behavior, or unusual demeanor at trial." *Cf. Phenis*, 909 A.2d at 153 (concluding that the trial court did not abuse its discretion in failing sua sponte to order a competency evaluation during trial where, among other things, the defendant was "able to conform his behavior to proper courtroom decorum").

and ability to assist in his defense." [28] *Cf. Robidoux,* 643 F.3d at 340 ("We can hardly find the [court's failure to initiate a competency inquiry] unreasonable when there is little evidence anywhere that [the defendant] failed to understand the proceedings and virtually none that he was unable to cooperate with counsel."); *United States v. Perez,* 603 F.3d 44, 48 (D.C.Cir.2010) (reasoning that "[e]ven defense counsel's vague suggestion that Perez might suffer from 'a psychological impediment,' . . . did not create reasonable cause to believe Perez was incompetent to stand trial in light of his demonstrated understanding of the proceedings and engagement with counsel before and during trial[,]" and that "[a]lthough Perez may have held dubious legal views and pursued an inadvisable strategy, none of this provided reasonable cause for the district court to question his competence to stand trial").

### 2. *Appellant's Waiver of the Right to Counsel*

"The Supreme Court has rejected 'the notion that competence . . . to waive the right to counsel must be measured by a standard that is higher than (or even different from)' the standard for competency to stand trial." *Phenis,* 909 A.2d at 155 n. 13 (quoting *Godinez v. Moran,* 509 U.S. 389, 398, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993)). A month after appellant's trial, however, in *Indiana v. Edwards,* 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008), the Supreme Court clarified that a defendant may be mentally capable of standing trial "yet lack the capacity to stand trial without benefit of counsel." *Id.*

---

**28.** Through counsel, appellant also argues that the counsel who assisted him at trial were ineffective in failing to request a competency hearing. For purposes of addressing this issue, we assume without deciding that appellant may lodge a claim of ineffective assistance of counsel with respect to the PDS lawyers who served as his standby counsel or attorney advisors. *Cf. Ali,* 581 A.2d at 380 (explaining that where the trial has been conducted with a hybrid arrangement for representation, as it was here, the defendant may assert an ineffectiveness claim that challenges counsel's competency only "within the limited scope of duties assigned to or assumed by counsel") (internal quotation marks omitted). We resolve the issue on the ground that, in light of the entire trial record as discussed above, appellant has not met his burden of showing that there is a "reasonable probability that he would have been found incompetent to stand trial" had the issue been raised and fully considered. *Jermyn v. Horn,* 266 F.3d 257, 283 (3d Cir.2001); *see Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (To succeed on a claim of ineffective assistance of counsel, a defendant must establish that his counsel's performance was not only deficient, but also prejudicial).

We note that in support of appellant's claim that the counsel who assisted him at trial provided deficient representation, appellate counsel submitted, as supplemental exhibits to appellant's § 23–110 motion, virtually identical affidavits from Mullin and Ohm. Both affidavits state that appellant "appeared to be suffering from some sort of mental disorder, both at the time of his alleged offense and during the court proceedings," and that appellant "frequently made statements that caused [them] to believe that Mr. Gorbey experienced delusions, . . . [that] appeared to motivate and inform Mr. Gorbey's decisions and actions at the time of his alleged offense" and "also appeared to motivate Mr. Gorbey's decisions during the court proceedings associated with this case." Both lawyers stated that they "did not pursue issues concerning Mr. Gorbey's mental health because Mr. Gorbey directed [them] not to do so" and that they "would have requested that the Court refer Mr. Gorbey for a mental health evaluation had Mr. Gorbey allowed [them] to do so." However, contrary to the assertion in appellant's briefs, nowhere in their affidavits did either counsel attest to a good faith doubt as to appellant's "capacity to understand the nature and object of the proceedings against him, to consult with counsel, [or] to assist in preparing his defense. . . ." *Drope,* 420 U.S. at 171, 95 S.Ct. 896.

at 173, 128 S.Ct. 2379 (citation and internal quotation marks omitted); *see also id.* at 175, 128 S.Ct. 2379 (stating that the question of mental competence for self-representation "calls for a different standard").[29] The Court recognized that a criminal defendant "may well be able to satisfy *Dusky's* mental competence standard, for he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel[,]" *id.* at 175–76, 128 S.Ct. 2379 and that "common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant." *Id.* at 176, 128 S.Ct. 2379 (quoting an *amicus* brief filed by the American Psychiatric Association) (internal quotation marks omitted).

▆▆▆▆▆▆ At the same time, the *Edwards* Court declined to adopt a "specific standard" for mental competence for self-representation, stating that it would leave to trial judges, who "will often prove best able to make more fine-tuned mental capacity decisions," the tasks of "tailor[ing] to the individualized circumstances of a particular defendant[,]" and of "tak[ing] realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." *Id.* at 177–78, 128 S.Ct. 2379. Thus, after *Edwards,* the observation we made in *Abney v. United States,* 464 A.2d 106 (D.C.1983), still applies: there is no "precise litany of questions" a trial court must ask before accepting a waiver of counsel. *Id.* at 108.[30] A formal inquiry may be unnecessary where there is "a compelling case of circumstantial evidence that the *pro se* defendant knew what he or she was doing." *Id.* (quoting *Fowler v. United States,* 411 A.2d 618, 623 (D.C. 1980) (concluding that there had been a valid waiver of counsel, despite the absence of an extended inquiry, where the defendant was represented by counsel prior to the waiver decision, was aware of the seriousness of the charges against him, was conscious of the advantages and responsibilities of legal representation, and was knowledgeable about criminal law)). However the inquiry is conducted, the trial court, "[i]n addition to determining that a defendant who seeks to . . . waive counsel is competent [to do so], . . . must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." *Godinez,* 509 U.S. at 400, 113 S.Ct. 2680.

Through counsel, appellant argues that the trial court erred by failing to "evaluate his mental health in connection with his . . . proceeding *pro se* " and by "neglecting

29. *See also United States v. DeShazer,* 554 F.3d 1281 (10th Cir.2009). In that case the Tenth Circuit observed:

[T]he *Edwards* Court held only that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Edwards,* 128 S.Ct. at 2388. Thus, while the district court was not compelled to find Mr. DeShazar competent to waive his right to counsel simply because the court had found

him competent to stand trial, it does not follow that the district court was absolutely prohibited from doing so. To the contrary, *Edwards* itself reaffirmed that a court may constitutionally permit a defendant to represent himself so long as he is competent to stand trial. *Id.* at 2385.
554 F.3d at 1290.

30. *See also United States v. Turner,* 644 F.3d 713, 722 (8th Cir.2011) (noting that the Supreme Court has never "adopted a list of essential points that must be conveyed to a defendant in order for a waiver of counsel to be deemed knowing and voluntary").

to ensure that he knowingly and voluntarily waived his right to counsel." For the reasons that follow, we reject this claim.

 We begin by noting that standby counsel Tulley told the court during pretrial proceedings that appellant was "competent, [and] making an intelligent, voluntary, and knowing waiver [of counsel]"—a statement to which the trial court was entitled "to give some credence." [31] Tulley also advised the court that appellant had "some familiarity with the system and was able successfully to represent himself in a federal case." [32] Appellant informed the court that he was 38 years old, had earned his GED, and had represented himself in eight to ten criminal matters in several state courts as well as in the federal court in Clarksburg, West Virginia. [33] He advised the court that he had knowledge of criminal law and procedure "from being run through the system so many times," and that he had utilized law libraries "a lot," had been provided with the rules of evidence and the Superior Court rules, and

had also studied "pretty well" the federal rules. Displaying his knowledge, he told the court that he understood that a failure to make objections during trial to evidence or to jury instructions "affects you on your appeal[.]" In addition, when the court advised appellant of the maximum penalties he could face, appellant responded by telling the court that the sentencing guidelines recommended a five-year sentence for a first-time offense on one of the mentioned charges.

Further, during each phase of the trial proceedings, appellant (who, the court observed, is a "very bright man") demonstrated his experience with the trial process as he handled an assortment of trial tasks. [34] Of importance, the trial court had already witnessed some of appellant's familiarity with the trial process by the time the court questioned him about his wish to represent himself. For example, during the proceedings on March 24, 2008, appellant told the court that the discovery he

---

**31.** *Ghane,* 593 F.3d at 784; *see also Turner,* 644 F.3d at 723 ("[C]ounsel's opinion should receive significant weight since counsel, perhaps more than any other party or the court, is in a position to evaluate a defendant's ability to understand the proceedings.") (alterations and internal quotation marks omitted).

**32.** According to the government's brief, following a hearing, appellant was permitted to represent himself in a 2006 case in the United States District Court for the Northern District of West Virginia. Appellant won an acquittal in that case. The district court had denied the government's motion seeking a competency evaluation. *Cf. Abney,* 464 A.2d at 109 (reasoning that defendant's multiple previous appearances in court "reinforce[ ] our holding that [he] knowingly and intelligently waived his right to counsel").

**33.** Appellant told the court that the West Virginia case involved firearms charges similar to the ones he faced in the instant case.

**34.** For example, appellant participated actively in the juror voir dire and jury selection

processes, giving the court his proposed voir dire questions, asking many follow-up questions, making arguments regarding whether prospective jurors should be stricken for cause (e.g., stating, "I would go for cause because ... [the juror] believed what [he] read in the newspapers [a]nd he had formally stated that the person would have to show him something to feel differently"), and keenly observing the whole process (e.g., remarking at one point that some of the jurors in the venire were sitting in the wrong seats). During the suppression hearing and trial, appellant cross-examined the government's witnesses; had a witness mark locations on an exhibit; invoked the rule on witnesses; asked for re-cross examination; asked chain-of-custody questions; made beyond-the-scope objections; objected to the introduction of evidence not produced during discovery; objected to a witness's reading from a document that was not in evidence; and objected to the prosecutor's instructions on the law during closing argument.

had received from the government had been "partial discovery," and that he was missing forms such as the PD–252 and PD–47. *Cf. United States v. VanHoesen,* 450 Fed.Appx. 57, 62 (2d Cir.2011) ("The district court's resolution of the self-representation issue in favor of competency finds ample support in record evidence, including VanHoesen's written submissions to the district court demonstrating his active interest in his own defense, and his testimony and responses to court inquiries indicating that he had performed his own legal research and had a detailed understanding of how a trial works.").

Notwithstanding appellant's obvious experience with trial proceedings, when the court asked appellant why he wished to represent himself and appellant answered that "the only way that I will receive a proper defense is if I do so myself," the court responded by strongly cautioning appellant about the "dangers and disadvantages" [35] that could ensue from waiving the right to counsel and, as already noted, about the potential penalties appellant would face if convicted. Appellant responded that he understood but "[believe[d] it would be to my best benefit for me to go ahead and represent myself at this point in time" with the assistance of standby counsel. The court urged appellant to reconsider, confirmed that Tulley was prepared to assist appellant as standby counsel, and told appellant that if he reconsidered and decided that he wished counsel to represent him "at some other point, then that will be fine." The court repeated its cautionary words at several points during the pre-trial and trial proceedings. For example, the court told appellant that "representing yourself puts you in a very precarious position," and that while things that counsel said "would not necessarily be used against you," "[t]hings that you say can and may be used by the Government against you at some later point." At another point, the court reminded appellant that "you can do serious damage to yourself and your case because of what you don't know."

The court also took steps to protect appellant's right to a fair trial.[36] Most significantly, as trial progressed, the court permitted a "hybrid representation" [37] arrangement that, among other things, enabled standby counsel Ohm, instead of appellant, to cross-examine the government's explosives expert. The court denied Ohm's request to allow him to do a portion of the closing argument,[38] but the court

---

**35.** *Ali,* 581 A.2d at 371.

**36.** The court did so in part by making an effort to ensure that appellant understood the rules that apply in examining witnesses. For example, the court discussed with appellant the difference between leading and non-leading questions. Further, the court told appellant that "if, after we proceed to trial, it appears to me that you're not able to represent yourself competently, and there's a possibility that you're not getting a fair trial because ... of some mistakes you might be making with some things that it appears you do not know, that I can essentially order [standby counsel] to represent you and to handle your case." The court also warned appellant about introducing into evidence police reports that were hearsay and that "the government could never move into evidence in their case-in-chief" (and appellant responded by explaining why he believed the documents contradicted a witness's testimony and thus were "beneficial to [his] case").

**37.** *McKaskle v. Wiggins,* 465 U.S. 168, 183, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (internal quotation marks omitted).

**38.** Ohm explained that he wanted to handle the portion of closing argument that would remind the jury of "the fundamental principles of the law in terms of reasonable doubt, presumption of innocence, [and] burden of proof" and to address the concept of constructive possession. Instead, the court itself instructed the jury on these matters.

allowed Ohm to interject arguments and to assist appellant in responding to the government's evidentiary objections throughout the proceedings.

Thus, although the trial court did not have the benefit of *Edwards,* the record reflects that the trial court "tailored" the manner of proceeding to appellant's "individualized circumstances" and "t[ook] realistic account of [appellant's] mental capacities[.]" *Edwards,* 554 U.S. at 177, 128 S.Ct. 2379. We are satisfied that the court, which had "the opportunity to observe and interact with [appellant] at length," [39] asked sufficient questions, cautioned and instructed appellant sufficiently, and had sufficient information to enable it reasonably to accept that appellant's decision to represent himself was knowing and voluntary. We discern no error in the trial court's conclusion that appellant "knew 'what he was doing and ... his choice was made with eyes open.'" August 18, 2010, Order at 4 (paraphrasing *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)).

### 3. *Appellant's Waiver of an Insanity Defense*

 Appellant's competence to stand trial is separate from the question "whether the defendant has made an intelligent and voluntary decision [to forgo an insanity defense]." *Frendak,* 408 A.2d at 367. As described in note 5 *supra,* this court held in *Frendak* that "whenever the evidence suggests a substantial question of the defendant's sanity at the time of the crime, the trial judge must conduct an inquiry designed to assure that the defendant has been fully informed of the alternatives available, comprehends the consequences of failing to assert the defense, and freely chooses to raise or waive the defense." 408 A.2d at 380; *see also Phenis,* 909 A.2d at 155 (noting that *Frendak* is concerned with whether the defendant recognizes "the availability of the defense and whatever advantages—as well as disadvantages—it may offer to defendant's case."). "The scope of [a *Frendak* ] inquiry ... will vary according to the circumstances present in each case[.]" *Patton v. United States,* 782 A.2d 305, 312 (D.C.2001) (internal quotation marks omitted).[40] However, "because the court is dealing with an individual whose sanity has been questioned, a cursory explanation or a rote interrogation cannot satisfy the court's duty." *Frendak,* 408 A.2d at 380. "The trial judge's decision whether to conduct a *Frendak* inquiry is reviewed for abuse of discretion." *Patton,* 782 A.2d at 312.

Through counsel, appellant contends that even though his "bizarre behavior at the time of and following his arrest raised sufficiently a question as to his sanity at that time," the trial court conducted only the most cursory inquiry, which failed to satisfy the requirements of *Frendak.* We agree that the trial court did not conduct the inquiry that *Frendak* envisions; as appellant's brief correctly asserts, the court did no more than confirm that appellant was, in fact, waiving the insanity de-

---

**39.** *Turner,* 644 F.3d at 724.

**40.** "In some instances, ... it may be sufficient for a trial judge [conducting a *Frendak* inquiry] to advise the defendant of the possible consequences of the insanity plea, become assured that the defendant understands those consequences by questioning the defendant about his or her reasons for rejecting the defense, and make a decision on the basis of the reasons given, the manner in which they are expressed, and any evidence of the defendant's mental capacity already in the record." *Frendak,* 408 A.2d at 380. In other instances, the inquiry may entail "verif[ying] that appellant ha[s] talked with his doctors about his insanity defense possibilities." *Wallace,* 936 A.2d at 779 n. 30.

fense.[41] We cannot agree, however, that the court erred in failing to take further action during the pre-trial and trial proceedings, because we cannot say that the information that was then before the court raised a substantial question about appellant's sanity at the time of the charged offenses. For that reason, "the obligation to conduct a *Frendak* inquiry was [not] triggered." *Howard*, 954 A.2d at 422.

"The quantum and nature of evidence that will trigger the obligation to conduct a *Frendak* inquiry is necessarily highly fact-bound and varies from case to case." *Phenis*, 909 A.2d at 155. Here, there was no evidence in the record that appellant had a history of mental illness;[42] at the time of his arrest, he complied with the arresting officer's orders and spoke rationally; he did not behave erratically in court; and neither appellant's standby counsel nor the government suggested at any point during the trial that appellant had lacked the capacity to recognize the wrongfulness of his actions or to conform his conduct to the requirements of the law.[43] Moreover, at the time appellant confirmed to the court that he was waiving an insanity defense, his then-standby counsel (Tulley), at least as far as the transcripts reveal, did not signal to the court

any concern about appellant's expressed waiver.[44]

While the facts of appellant's charged crimes were bizarre, that alone is not enough for us to conclude that, before or during trial, the trial court must have had a *substantial* doubt about appellant's sanity. Our opinion in *Patton* is instructive. There, the defendant, after "acting 'jumpy' and handling a gun and a knife" and telling his niece to "stab him in the neck," had "without warning, stabbed his mother with a knife." *Patton*, 782 A.2d at 308. At the time of his arrest, the defendant "was acting kind of strange in that manner where we would ask him something and he would go off on a different subject." *Id.* During his preliminary hearing, he "was acting fidgety, pushing his chair away from the table, and repeatedly looking at the double doors of the courtroom[,]" and, "while a witness was testifying, he stood up when the judge was talking with the witness." *Id.* His "strange behavior culminated at the conclusion of the hearing, when he attempted to run from the courtroom and law enforcement officers apprehended him before he could escape." *Id.* A psychiatrist, who had briefly interviewed the defendant several months after the crime to determine his competency to stand trial, found that he "exhibited 'severe antisocial

**41.** The issue of appellant's sanity at the time of the charged offenses came up only when the prosecutor said that he "want[ed] to make sure ... the defendant understands that he's waiving the right to raise that defense at trial by failing to provide us notice." The following exchange then occurred:

Mr. Gorbey: Yes, I'm waiving it.
The Court: Mr. Gorbey, do you understand?
Mr. Gorbey: Yes, I understand.
The Court: All right.

**42.** *Cf. Briggs*, 525 A.2d at 593 (concluding that the trial court abused its discretion in failing to conduct a *Frendak* inquiry where "competency examinations indicated classic,

long-term mental illness," a background that was of "central significance").

**43.** "To establish a prima facie case [of insanity], the defendant must present sufficient evidence to show that at the time of the criminal conduct, as a result of a mental illness or defect, he lacked substantial capacity to recognize the wrongfulness of his act or to conform his conduct to the requirements of the law." *Patton*, 782 A.2d at 311–12 (citation and internal quotation marks omitted).

**44.** As already noted, only *after* trial was the court apprised that appellant had become displeased with Mullin because she had "identified this as a mental health case."

characterological traits that included a sense of entitlement, defiant disregard for societal norms, manipulativeness and . . . a lack of empathy for others' " (but found him competent to stand trial).[45] *Id.* at 309. Mid-trial, when the defendant's trial counsel moved to withdraw on the ground that she had been ineffective in not properly explaining to the defendant the insanity defense, the trial court demurred, commenting that "you have to have an insanity defense available to waive it" and stated that the crime "was not a product of insanity" and that "a perfectly sane person . . . has no insanity defense." *Id.* at 309. After the court made those remarks, "the proceedings resumed without further discussion of removal of counsel or a defense of insanity." *Id.* at 310. Upon that record, we "perceive[d] no error in the manner in which the trial court evaluated the issue of an insanity defense during trial." *Id.* at 311. In other words, we perceived no error in the court's not having conducted a *Frendak* inquiry; we were satisfied that the evidence of appellant's bizarre crime and strange behavior at the time of his arrest and on the days following did not "suggest[ ] a substantial question of the defendant's sanity at the time of the crime." *Frendak*, 408 A.2d at 380.

We held in *Patton* that even when there are "many hints of appellant's possible mental illness," a trial court does not abuse its discretion in failing to conduct a *Frendak* inquiry during trial when it has "conflicting information regarding appellant's mental condition." *Patton*, 782 A.2d at 314. We think it fair to say that the pretrial and trial record in this case presented the trial court with (at worst) conflicting signals about appellant's mental condition at the time of the charged offenses. Accordingly, we cannot conclude that, prior to the sentencing phase of the trial proceedings, the trial court erred in accepting appellant's waiver of the insanity defense without having conducted the type of inquiry required under *Frendak*.

### B. The Sentencing Proceedings

■ That brings us to the sentencing proceedings, as to which we reach a different conclusion. Through counsel, appellant highlights, as one of the "red flags" that should have caused the trial court to make further inquiry, the "PDS report raising mental health issues that was submitted to the trial court for sentencing consideration." In the paragraphs that follow, we describe that report and other developments that occurred as the matter proceeded to sentencing.

During a post-verdict proceeding on July 11, 2009, the court noted that appellant had asked that Ohm be appointed his counsel for sentencing, but had subsequently requested the appointment of new counsel. The court appointed (non-PDS lawyer) Donald Dworsky to represent appellant. During the same proceeding, the prosecutor noted that appellant had refused to meet with the pre-sentence report writer. When court convened again on August 1, 2008, appellant told the court that Dworsky was "ineffectively assisting [him]." At the bench, appellant asserted that all Dworsky had done was make arguments regarding the pre-sentence report and that he had not contacted appellant's family or individuals who had worked with him to be "material witnesses" for him. When the court responded that this was

---

45. The psychiatrist also opined that the defendant had no mental illness when he interviewed him nearly five months after the crime, but he gave that opinion without having conducted a productivity examination (i.e., "a psychiatric examination which inquires into the defendant's sanity at the time he committed the offense"). *Id.* at 309, 309 n. 3.

the task of the pre-sentence report writer, appellant said that he wasn't sure "how impartial [their work] is." Appellant also complained of Dworsky's having "been in direct contact with" Ohm, notwithstanding appellant's directive that he "wanted everybody from the Public Defender Service taken away from this case."

■ The sentencing proceeding was held on August 15, 2008. At the beginning of the proceeding, Dworsky explained that he had been "discharged" by appellant and had filed a motion to withdraw as counsel.[46] Dworsky explained to the court *ex parte* that appellant was upset that Dworsky had filed, as an attachment to the "Defense Memorandum in Aid of Sentencing," that "PDS matter ... again, the mental health stuff." The record shows that the attachment to which Dworsky was referring was an August 1, 2008, letter, addressed to the court, from Daphne Kirksey–Clark (MA, LPC) of the PDS Offender Rehabilitation Division, who had met with appellant on a number of occasions. Kirksey–Clark's letter set out a "Clinical Summary" that states, *inter alia*, that appellant "has an undiagnosed, and consequently untreated, mental health problem that significantly distorts his perception of reality" and his "resulting behavior."[47]

Dworsky told the court that the result of his having filed the PDS Clinical Summary was that appellant "hasn't even talked to me, so he's not having any interaction with me." He further advised the court that appellant "doesn't want anyone to talk about his possible mental issues" and that Dworsky had "stepped over that line" by filing the PDS Clinical Summary with the court. Appellant told the court that he wanted the court to disregard the PDS Clinical Summary.

The court also heard and credited testimony from a representative of the Court Services and Offender Supervision Agency that appellant had "absolutely refused to cooperate with the pre[-]sentence report writer." When the court thereafter turned to the government for its sentencing recommendation, the prosecutor stated that

---

**46.** The court denied the motion to withdraw, finding that Dworsky's efforts on appellant's behalf had been "consistent with [his] duties and obligations as counsel." We discern no reason to disagree with the trial court's assessment, notwithstanding appellant's assertions that Dworsky provided ineffective assistance in that he (1) "did not contact any of Gorbey's family or other ... potential character witnesses for Gorbey at sentencing"; (2) "did not retrieve any verifications for Gorbey['s prior employees, job skills, or education[ ]"; (3) "lied in open court" by saying that the prosecution had shown him certified court dispositions" (with respect to prior convictions used for sentencing-guidelines calculations); (4) failed to assist in creating "a proper pre-sentence report for Gorbey"; (5) "conspired with [the] ... removed P.D.S. lawyers" and filed a sentencing memorandum by PDS that "attack[ed] and degrade[d] Gorbey and his family" through psychological evaluations; and (6) "made no arguments to court services." We note that "a defendant is

not generally entitled to have other persons testify for him at sentencing." *Grant v. United States*, 509 A.2d 1147, 1155 (D.C.1986).

**47.** The letter also opines that it is likely that appellant has a "persecutory type" "delusional disorder given his preoccupation that federal government agencies have conspired, and continue to conspire, against him." It further states that individuals with this disorder "have no insight into the fact that they are experiencing problems with their thoughts, emotions and behavior." The letter notes that "the presence of the delusions does not (necessarily) cause significant impairment in functioning" and that the "individual may or may not be able to work or interact with other individuals[.]" It concludes that appellant "would benefit from a psychological as well as a psychiatric evaluation to further assess the severity of his delusional belief systems and to determine if he would benefit from antipsychotic and possibly antidepressant medications."

he did not agree with everything in the PDS Clinical Summary, but he acknowledged the "possibility that there could be some underlying health issue or mental health issue that may be causing [appellant] to spiral ... out of control." The prosecutor told the court that appellant's genuine belief that he is the subject of a conspiracy had "compelled him to do things, such as ... dragg[ing his family] with a truck load full of weapons and ammunition across country, ... liv[ing] in the middle of the winter in the woods simply to get away from these perceived threats," and "also compelled him to take the steps he took in this case, bringing him to Washington, D.C. with a truckload full of weapons, a bomb in the car, and to arm him[self] with a bulletproof vest, sword, shotgun, ammunition and start walking down a public street in broad daylight ... in order to meet with the Chief Justice." The court responded, "Mr. Gorbey has asked that I not consider that [Clinical Summary], given his relationship with the Public Defender Service, so I'm not going to consider that report."

▉ Thus, by the time of sentencing, the court—even though it declined to consider the information—had been presented with (1) a Clinical Summary from a mental health professional that called into question whether the conduct of which appellant was convicted was the result of a "mental health problem that significantly distorts his perception of reality" and his "resulting behavior"; and (2) a statement by the prosecutor, who spoke after having

reviewed the Clinical Summary, that appellant's belief that he is the subject of a conspiracy had "compelled him to take the steps he took in this case" and caused him to "spiral out of control." [48] These circumstances at the time of sentencing are analogous to those we analyzed in *Patton*. There, we noted that "[d]uring sentencing, new information was presented regarding defendant's mental state." 782 A.2d at 310. Specifically, "[t]rial counsel had addressed a letter to the court the day before sentencing, enclosing the report of a psychologist," which had been prepared "to provide information 'concerning [appellant's] cognitive and personality functioning in order to better understand his behavior and to help develop a plan of interventions for sentencing.'" *Id.* The psychologist's report "suggested that mental illness may have been a factor in the stabbing[,] stating ... that the stabbing of his mother may indeed be a product of a delusional system[.]" *Id.* These facts prompted us to hold that "once the court was faced with a substantial question during sentencing [based on an evaluation conducted by a mental health professional] as to appellant's mental capacity at the time of the crime, it should have conducted a full *Frendak* inquiry." 782 A.2d at 311 (remanding for such an inquiry). We are persuaded that the facts surrounding the sentencing proceeding in the instant case cannot meaningfully be distinguished from the circumstances that caused us, in *Patton*, to remand for a *Frendak* hearing.[49] Accordingly, as we did in *Patton*,

48. Together, the Clinical Summary and the prosecutor's statement pointed toward "a critical element of the [insanity] defense—a causal relationship between the criminal conduct and [the defendant's] mental disease." *Pegues v. United States*, 415 A.2d 1374, 1378 (D.C.1980).

49. By the date of sentencing, the court had also been presented with evidence that appel-

lant would not consult with counsel and that he distrusted and would not cooperate with the pre-sentence report writer who might have prepared a report supportive of a more lenient sentence. For that reason, the question arises whether the circumstances also gave the trial court a substantial reason to question whether appellant was able to consult with counsel and assist with his defense

we hold that the trial court erred in failing to conduct a *Frendak* inquiry before sentencing appellant.[50]

For the foregoing reasons, and because, in Part II *infra,* we reject most of the other arguments that appellant presents in challenging his convictions, we will remand this matter to the trial court for a *Frendak* inquiry.[51] Upon remand, "[t]he trial judge should first ascertain whether appellant was advised about and voluntarily waived a possible insanity defense—or, assuming that appellant is currently competent, is now willing to waive the defense after being properly advised. If the trial court is persuaded that appellant has knowingly and voluntarily waived the defense, that ends the matter[,]" *Phenis,* 909 A.2d at 159–60, and appellant's "convictions shall stand." *Briggs,* 525 A.2d at 594.[52] If,

**50.** We recognize that, during the sentencing proceedings, the trial court was presented with conflicting information: Dworsky, although arguing to the court that a downward departure from the sentencing guidelines was in order because of appellant's mental state, commented that appellant's mental state "was certainly not sufficient to provide a not guilty by reason of insanity plea[.]" However, as already described, the court was made aware that Dworsky's interactions with appellant had been limited.

We also appreciate the difficult position in which the trial court was placed in this case. It is clear from the record that, in stating that it would not consider the Clinical Summary, the trial court paid heed to appellant's "relationship with [PDS]." We take that reference by the court to mean that the court sought, commendably, to respect the confidentiality of what appellant told the professionals at PDS during the course of PDS's representation of appellant, and to honor appellant's request, made at the time he discharged Ohm, that PDS lawyers were to have no further involvement in his case. At the same time, however, the court was obligated to take into account all relevant and available information in order to properly exercise its sentencing discretion, *cf. Grant,* 509 A.2d at 1156 (citing *Johnson v. United States,* 398 A.2d 354, 366 (D.C. 1979)), and (having denied Dworsky's request to withdraw as counsel) to give due regard to the information Dworsky submitted in aid of sentencing.

For purposes of sentencing, and thus whether he was competent to be sentenced. *See Godinez,* 509 U.S. at 407, 113 S.Ct. 2680 (explaining that the standard of competency applies "throughout criminal proceedings, not just to the formal trial"); *Drope,* 420 U.S. at 181, 95 S.Ct. 896 ("Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial."). We conclude that, on balance, the circumstances did not raise a substantial question about appellant's competency. We reach this conclusion because the record shows that appellant was actively attuned to the sentencing proceedings. For example, he challenged the presentence report's calculation of points under the sentencing guidelines, challenged as inaccurate and duplicative information taken from a Virginia probation report, and complained about the absence of certified documentation of his criminal record in Maryland. Although he would not communicate with sentencing counsel and with the presentence report writer, the test for competency, as we have already noted, "hinges solely upon whether [the defendant had] a sufficient present *ability*" to consult with counsel and to assist in his defense, not upon whether he actually did so. *Howard,* 954 A.2d at 419 (internal quotation marks omitted). We discern no basis for concluding that appellant lacked that ability at the time of sentencing.

**51.** "Because the record suffices to remand for the trial court to conduct a *Frendak* inquiry, we need not address whether either trial or [sentencing] counsel's failure to bring the matter to the trial court's attention ... would furnish independent grounds for relief." *Patton,* 782 A.2d at 314 n. 12. That suffices to address appellant's claim, through counsel, that the counsel who assisted appellant at trial were ineffective "in failing to ... determine the appropriateness of pursuing mental health-related defenses."

**52.** Our case law also describes the course the trial court should follow if it determines that appellant did not knowingly and voluntarily

after remand, appellant's convictions stand, and if, upon consideration of any information presented upon remand, the court determines that it would have sentenced appellant differently had the information been available at the time of appellant's sentencing on August 15, 2008, the court in its discretion shall vacate appellant's original sentences and resentence him. *See Wasman v. United States,* 468 U.S. 559, 563–64, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984) (explaining that, in connection with sentencing, a trial court "must be permitted to consider any and all information that reasonably might bear on the proper sentence for the particular defendant," since "highly relevant—if not essential—to [the court's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics") (internal quotation marks and alterations omitted).

## II. Sufficiency of the Evidence to Sustain the Convictions for CDW, Possession of an Explosive Device, And Attempted Manufacture or Possession of a WMD

■■■■ When assessing the sufficiency of the evidence, we must "view the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of

fact." *Freeman v. United States,* 912 A.2d 1213, 1218–19 (D.C.2006) (quoting *Curry v. United States,* 520 A.2d 255, 263 (D.C. 1987)). "We do not distinguish between direct and circumstantial evidence, and the government is not required to negate every possible inference of innocence." *Id.* at 1219 (internal quotation marks omitted). Rather, "it is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." *Id.* (internal quotation marks and alteration omitted).

### A. The CDW Convictions

■■■■ In challenging the sufficiency of the evidence to support his CDW convictions, appellant contends that there was no proof that he intended to use the shotgun and sword, which he asserts was a souvenir, as dangerous weapons. We reject this claim because "[o]nly in cases where the charge of carrying a dangerous weapon is based on an item that has some useful natural purpose (other than to inflict injury) has this court required the government to prove that the defendant intended to use the object in question *as* a dangerous weapon." *Wright v. United States,* 926 A.2d 1151, 1155 (D.C.2007) (emphasis in original). Here, both weapons—a shotgun and a sword—have no natural purpose other than to inflict injury. *Cf. State v. Harrell,* 342 S.W.3d 908, 915 (Mo.Ct.App.2011)

---

waive the insanity defense before trial and does not currently wish to waive the defense (or "is presently incapable of making a voluntary and intelligent decision whether to do so"). *Briggs,* 525 A.2d at 594–95; *see also Phenis,* 909 A.2d at 159–60. We acknowledge that there are reasons to question the continuing validity of some aspects of the course described in *Frendak, see, e.g., Phenis,* 909 A.2d at 164–65 (Glickman, J., concurring) (expressing "serious misgivings" about *Frendak's* holding that the trial court has "discretion to raise an insanity defense *sua sponte*" where

"the defendant is not capable of making, and has not made, an intelligent and voluntary decision"); however, we deem it premature to address such concerns here and thus leave them for a future matter. The government suggests more broadly that we should decline to follow *Frendak* because its philosophical basis has been undermined by more recent decisions of the Supreme Court and the D.C. Circuit. We decline to consider such a weighty matter based on an argument outlined, but not developed, in a footnote of the government's brief.

(replica sword that had been used as a children's carnival prize met the statutory definition of a deadly weapon). Therefore, appellant's contention does not establish that the evidence was insufficient to sustain the CDW convictions.

### B. The Explosive Device and WMD Convictions

■■■■■■ Regarding his convictions for possession of a destructive device and attempted manufacture or possession of a WMD,[53] appellant first contends that there was a failure of proof that appellant had a "knowing, conscious, or deliberate state of mind with respect to attempting to manufacture or possess a [WMD]." The gist of appellant's argument is that the government failed to prove that he "possessed" the device found in the truck, since the device "was not found on [his] person or in his possession, but was rather discovered three weeks after [his] arrest, in a vehicle that [he] did not own and which vehicle had been subjected to police measures that substantially altered its condition." However, "possession can be either actual or constructive," *Brown v. United States*, 691 A.2d 1167, 1169 (D.C.1997), and the government's theory was that, at the time of his arrest, appellant constructively possessed the items found in the truck. There was ample evidence to establish constructive possession.

■■■■ "Constructive possession of a weapon requires proof that a defendant (1) knew of the weapon's location; (2) had the ability to exercise dominion and control over it; and (3) intended to exercise such dominion and control." *Taylor v. United States*, 662 A.2d 1368, 1372 (D.C.1995). "The government may establish these elements by either direct or circumstantial evidence." *Id.* at 1372–73. Here, although appellant testified that he did not drive the truck into the District of Columbia, he did not dispute that the truck belonged to his girlfriend, Amy Toothman. Moreover, at the time of his arrest, appellant had in his pocket the keys to the truck and the truck's registration papers. Toothman identified the truck as belonging to appellant even though it was titled in her name, and she also testified that appellant drove the truck on January 18, 2008, and that he "[u]sually ... would not allow anyone else to drive [it]." Neff testified that appellant drove the truck to Neff's house the morning of January 18, 2008, and Charles Ponzoo, a friend of appellant,

---

53. Appellant (through counsel) claims in addition—and for the first time on appeal—that the WMD statute is unconstitutionally vague. Appellant's *pro se* briefs make a similar unpreserved claim about the CDW and UA statutes. Ordinarily, we decline to consider constitutional challenges raised for the first time on appeal unless " 'the statute is so clearly unconstitutional that it should have been ruled upon by the trial court despite the failure of appellant to raise the point below.' " *In re S.K.*, 564 A.2d 1382, 1384 n. 2 (D.C.1989) (quoting *In re W. E. P.*, 318 A.2d 286, 289 (D.C.1974)). The statutes here do not meet that criterion, and thus we decline to address these claims. We also reject the claim that the counsel who assisted appellant at trial provided ineffective assistance by failing to challenge the vagueness of the WMD statute.

Even assuming, as appellant argues through counsel, that the WMD statute is so vague as to make it unclear whether possessing a firecracker would run afoul of the statute, we have little difficulty concluding that "[a]n ordinary person would understand that the behavior charged against appellant"—attempting to possess a WMD by possessing a duct-taped object with components consisting of a metal can (with a hole in the bottom that could accommodate a firecracker), explosive black powder, metal pellets, and glass—"is prohibited." *Dickens v. United States*, 19 A.3d 321, 326 (D.C.2011). Counsel's "failure to file a meritless motion [contending that the WMD statute was unconstitutionally applied in this case] does not constitute ineffective assistance of counsel." *Washington v. United States*, 689 A.2d 568, 572 (D.C.1997).

testified that he had never seen anyone other than appellant and Toothman drive the truck. Further, although Toothman testified she had not seen appellant with the device, she also testified that appellant liked to keep his weapons behind the passenger seat of the truck, the same place where the testimony indicated the device was found. Toothman further testified that the other weapons found in the truck, including "shotgun shells . . . a lot of ammunition [and] other weapons," as well as a "sword" and "gun," belonged to appellant. From her testimony, the jury could infer that appellant "was familiar with the contents of the [truck] and that he was specifically knowledgeable about" all of the weapons, including the device, found therein. *See Taylor,* 662 A.2d at 1373.

 The briefs next argue that the government failed to prove that "the object discovered in [the] truck . . . satisfied the definition of a WMD [and an explosive device] according to the statute[s]," i.e., D.C.Code §§ 22–3154 and –4515a (b). The WMD statute prescribes punishment for any person who "attempts or conspires to manufacture or possess a weapon of mass destruction capable of causing multiple deaths, serious bodily injuries to multiple persons, or massive destruction of property[.]" D.C.Code § 22–3154(b). The statute defines "[w]eapon of mass destruction" to include "[a]ny destructive device that is designed, intended, or otherwise used to cause death or serious bodily injury," such as "an explosive," "[b]omb," or "[d]evice similar to any of th[ose] devices," or "[a]ny combination of parts either designed or intended for use in converting any device into [an explosive] device . . . from which

such device may be readily assembled." D.C.Code §§ 22–3152(12)(A)(i)(I) and (iii). The explosive device statute makes it unlawful to "manufacture . . . possess, or transport any device, instrument, or object designed to explode or produce uncontained combustion, with the intent that the same may be used unlawfully against any person or property." D.C.Code § 22–4515a (b). We are satisfied that the evidence sufficed for the jury to convict appellant under both statutes.

The government presented testimony by FBI Special Agent Hickey, a forensic analyst in the FBI laboratory explosives unit, who examined the components of the device found in the truck as well as digital photographs of the device taken before it was disrupted. He testified that, although the can component had been split in two by the bomb squad's disruptive tool, he could see that there was a small hole in the bottom of the can that would have allowed a firecracker to be inserted "to get the energy from outside into the main charge." Inside the can was black powder, which Hickey explained is "a low explosive" which, if "exposed to a flame or a significant amount of energy, will immediately expend all its energy in bursts." Hickey further testified that "at least three f[eet] of duct tape"[54] surrounded the can, and that attached to the can were a bottle and lead or "shot." Hickey told the jury that the fragmentation from the explosion of the device would have included pieces of the can and bottle as well as the approximately 250 lead spheres or pellets. He stated that "[b]ased on [his] examination," he would "refer to this [device] as a very crude anti-personnel device" or IED [i.e., an improvised explosive device].[55] He fur-

---

**54.** The duct taped served to reinforce the can, as "the stronger the container, the more pressure can build up inside the can."

**55.** Hickey explained that "[i]f you have black powder in a container with some type of a fusing system, then it's very likely that would be some type of improvised explosive device."

ther testified that the device "was designed to explode," and "once this device exploded, ... people in close proximity—hit by these fragments could be severely injured or possibly killed."

On cross-examination, Hickey acknowledged that the black powder container he examined "is very similar to the container that one would buy black powder in," and that he could not say, based on the photos in evidence, whether the black powder found on the floor bed of the truck "was actually ever inside the container." He further acknowledged that the device was "fairly small" and that he could not "say that it was a functional IED at the time that it was disrupted [by the bomb squad]." He agreed that a fusing system would have been required to initiate the device, and that he did not know whether there was a fusing system in place at the time the bomb squad disrupted the device. Hickey testified, however, that even without a fusing system, the device could readily have been converted into an IED: a "functioning IED could be readily assembled from the components" examined in this case.[56]

The jury could reasonably infer from the foregoing testimony that the device was, within the meaning of D.C.Code § 22-3154(b), a destructive device or weapon "capable of causing multiple deaths [or] serious bodily injuries to multiple persons," and that it was "an "explosive," "bomb," or, at the very least, a "combination of parts" "from which [an explosive or bomb] may be readily assembled." The jury could also reasonably find that the components found in the truck constituted, within the meaning of D.C.Code § 22-4515a (b), a "device, instrument, or object designed to explode or produce uncontained combustion[.]" Even though the device had no internal fusing source, officers found firecrackers in the truck, which, according to Hickey's testimony, could have been fitted in the device and used for that purpose.

Finally, appellant argues that the evidence did not suffice for the jury to find that he "understood the nature of the object, or that he knew it was a destructive object capable of causing serious bodily injury or significant property damage," as

56. USCP Sergeant Michael DeCarlo, a member of the bomb squad, was called by appellant as his expert in the "recognition and disruption of ... explosive devices." On February 8, 2008, after the second search of the truck revealed the device, DeCarlo reviewed photographs of the device. DeCarlo acknowledged that he reported to his superiors that what he saw was "a device," but that "[n]obody's lives were in jeopardy just sitting the way it was." He stated that the device "would not go off by itself" and in that sense was "no different than cans sitting in a hunting store or in a Wal–Mart, where you walk in and there's cans of black powder and shotgun shells." DeCarlo told his superiors that the device was "not an IED" or "bomb," because there was "no initiating source" and "no power source" to detonate the device. He agreed, however, that the device was "an IED that was built" and was "an explosive device" that "very easily could have been ignited" and

caused fragmentation, which would have "maximize[d] the deadliness" of the device. On cross-examination, the government elicited testimony that DeCarlo (who had been the "highest ranking bomb squad official" on the scene when appellant's truck was first searched on January 18, 2008) had been demoted after failing to find the device during the first search, and had made his comments, which minimized the significance of the device, during an "accusatory interview."

USCP Sergeant Charles Wood, a senior member of the bomb squad, also testified for appellant as an expert in "bomb recognition." Sergeant Wood reviewed photographs of the device and concluded that it was likely not a functioning explosive device because there was "no way to detonate [it]." He stated, however, that, fully assembled and functional, the device could have caused death or serious bodily injury to more than one person.

required for a conviction under D.C.Code § 22–3154(b); or that he possessed the device "with the intent that the same may be used unlawfully against any person or property." D.C.Code § 22–4515a (b). Again, we disagree. Hickey testified that the device was "clearly designed to be an anti-personnel weapon. There's no other reason to combine these components." DeCarlo similarly testified that "I considered it a device that was made to cause harm to others." He told his superior that "somebody ... made this device for the intent of ... hurting people." In addition, Wood testified that "the can of black powder, the shotgun shells, and the BBs" were components of "[an] anti-personnel device" that was designed to "fragment and create shrapnel," and that "the only reason you assemble components in that particular fashion is to maximize death or serious bodily injury to anybody near that device." Thus, according to all of the experts, the obvious purpose of the device was to cause injury to people. The experts' testimony allowed the jury to conclude that, in possessing the devices, appellant understood and had that purpose.

## III. Impartiality of Jury

Appellant argues that he was denied his constitutional right to be tried by an impartial jury because the court (1) declined to strike a juror who "express[ed] animosity[ ]" to the rest of the jurors and (2) subsequently denied appellant's request for a mistrial. We reject this argument. During a break in the trial, the juror in question "expressed some frustration [to Ms. Franklin, the deputy clerk,] ... that the defendant was calling witnesses who were saying the same thing over and over

again." The next day, the trial judge conducted a voir dire of the juror. The juror told the court that he had not said "how [he] felt" to anybody besides Ms. Franklin, and he assured the court that any frustration about the length of the trial had "absolutely not" affected his ability to be fair and impartial.

 We have held in similar circumstances that it is "sufficient that the juror asserts he or she is able to lay aside his or her impressions and render a verdict based on the evidence presented in court and the court assures itself that this assertion is valid." *Welch v. United States*, 466 A.2d 829, 836 (D.C.1983) (citing *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)). We discern no error here in the trial court's determination that the juror could be fair and impartial, recognizing that this determination, "in which demeanor plays such an important part, is particularly within the province of the trial judge." *Id.* (quoting *Rease v. United States*, 403 A.2d 322, 325 (D.C.1979)). Moreover, "a defendant who claims that he was deprived of a trial before an impartial jury must sustain that claim not as a matter of speculation but as a demonstrable reality[.]" *Id.* at 836 (internal quotation marks omitted). Here, nothing in the record suggests that the juror harbored any animosity toward appellant or had otherwise lost the ability to view the case through a fair and impartial eye. Appellant's argument rests on mere speculation about the juror's feelings toward him. Accordingly, we cannot conclude that the court abused its discretion in denying appellant's motion for a mistrial.[57] *See Catlett v. United States*, 545 A.2d

---

57. Appellant also suggests that he was tried by a biased jury consisting of individuals "connected with Hom[e]land security, police, prosecut[o]rs and ... press stations," who were exposed to pretrial publicity. However, all of the jurors questioned about these affiliations stated that they could deliberate fairly and impartially, and appellant's argument that they were biased against him rests entirely on speculation.

1202, 1213 (D.C.1988) ("[A] trial court has broad discretion in deciding whether to excuse a juror for just cause, and will be reversed only upon a showing of abuse of that discretion.").

## IV. Ineffective Assistance of Counsel

As we have already noted, our holdings above make it unnecessary for us to address appellant's argument, made through counsel, that the counsel who assisted him during the pre-trial and trial proceedings were ineffective in failing to request a hearing to determine whether he was competent to stand trial and to represent himself, and in failing "to determine the appropriateness of pursuing mental health-related defenses." *See* notes 28 and 51 *supra.* In his pro se briefs, appellant advances the additional argument that the trial court erred in denying without a hearing the claim, presented in his D.C.Code § 23–110 motion, that standby counsel Ohm was ineffective in failing to secure a rebuttal witness to address the explosive device and WMD charges.

■■■■ The record shows that Ohm initially assumed some responsibility for obtaining an expert witness to "to rebut [Agent] Hickey's proffered expert testimony."[58] However, appellant thereafter stated that he "would prefer not to have any delays in the court," and that he believed that DeCarlo and Woods "qualify as enough technicians to testify [for the defense]." Thereafter, the court permitted DeCarlo and Woods to testify as defense experts. We agree with the trial court that appellant's "unequivocal assertion that []he wished to proceed to trial without the delay that obtaining an expert would cause, negates any failure that could be attributed to Mr. Ohm in his role as standby counsel." We note, moreover, that appellant has not suggested what testimony helpful to the defense a different expert could have been expected to offer. Accordingly, he has not shown prejudice from what he alleges was his counsel's allegedly deficient performance.[59]

## V. Merger

■■■ Appellant contends that his convictions for possession of an explosive device (Count 14) and attempted manufacture or possession of a WMD (Count 15) should merge. "In determining whether multiple convictions are constitutionally permissible for criminal conduct which violates two distinct statutory provisions, absent a clearly contrary legislative intent, we apply the *Blockburger* test." *Sanchez–Rengifo v. United States,* 815 A.2d 351, 354 (D.C.2002). Under *Blockburger,* "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States,* 284 U.S. 299,

58. Ohm stated, "I will also, at [Mr. Gorbey's] instruction, be ... making contact with the bomb expert to see if he's available."

59. Appellant also claims that his counsel appointed by this court rendered ineffective assistance, e.g., by "raising unjustified competency issues" and by neglecting to raise most of appellant's "real appeal issues upon appeal." This argument is premature. "If an appellant claims ineffectiveness of appellate counsel, that issue 'must be litigated as an independent claim [after the appeal is decided], which requires [as a first step, a successful motion to] recall ... the mandate of the direct appeal.' " *Hardy v. United States,* 988 A.2d 950, 961 (D.C.2010) (quoting *Wu v. United States,* 798 A.2d 1083, 1091 (D.C.2002)). That process will provide appellant a sufficient forum to address the various issues he raises in connection with Burton's representation and the handling of his appeal by this court.

304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The focus is on the statutory elements of each offense, not on the particular evidence adduced at trial. *See Byrd v. United States,* 598 A.2d 386, 389 (D.C.1991) ("The *Blockburger* test has nothing to do with the *evidence* presented at trial. It is concerned solely with the statutory elements of the offenses charged." (quoting *Grady v. Corbin,* 495 U.S. 508, 522, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990) (emphasis in original))).

 Here, because each of the offenses related to the device required proof of an element which the other did not, the offenses do not merge. A conviction for "possession of an explosive device" requires proof that a defendant manufactured, transferred, used, possessed, or transported any device designed to explode or produce uncontained combustion, with the intent to use that device unlawfully against another person or property. A conviction for "possession of a WMD" does not require proof that the device be designed to explode or produce uncontained combustion. A WMD conviction requires proof that the device was capable of causing multiple deaths or serious bodily injuries to multiple persons, or massive destruction of property. *See* D.C.Code § 22–3154. By contrast, "possession of an explosive device" need not entail a device with the potential to seriously injure or kill multiple victims. Thus, these two offenses do not merge.

 Appellant's convictions for possession of a firearm by a convicted felon, CDW, and UF also do not merge, because each requires " 'proof of an additional fact which the other offense does not' " [60]— respectively, a prior felony conviction, "carrying," and lack of firearm registration. However, as the government notes, several of appellant's other convictions do merge. The two convictions for CDW do merge, as do the multiple convictions for UA.[61] *See Bean v. United States,* 576 A.2d 187, 191 (D.C.1990) (holding that the defendant's conduct in carrying both a knife and a rifle constituted a single violation, not multiple violations, of the statute prohibiting CDW). Accordingly, we direct the trial court on remand to vacate one of the CDW convictions and all but one of the UA convictions.[62]

---

**60.** *Tyree v. United States,* 629 A.2d 20, 23 (D.C.1993) (internal quotation marks omitted).

**61.** Appellant argues that nothing in D.C.Code § 7–2506.01 states that ammunition must be registered. The relevant point is that at the time of appellant's offenses, D.C.Code § 7–2506.01(a)(3) (2001) provided that no person was permitted to possess ammunition in the District of Columbia unless he held a valid registration certificate for a firearm of the same gauge or caliber. There was no dispute that appellant lacked the required firearm registration.

**62.** In consideration of appellant's claim that he was precluded from introducing evidence that he innocently possessed the .45 caliber round found in his backpack, and assuming without deciding that the claim has merit, we also direct the trial court to include the UA conviction relating to the .45 caliber round (Count Six) among the UA convictions that are vacated. This disposes of appellant's argument that the .45 caliber round should have been suppressed because it was found in his backpack, which was searched without a warrant and (appellant contends) not incident to his arrest. As to other items found in the backpack, we agree with the government that, although testimony at trial may have "cast the search of the backpack in a somewhat different light" than was described at the suppression hearing, appellant failed to renew his motion to suppress the evidence from the backpack or to argue that the trial testimony undermined the suppression hearing testimony. Thus, he is precluded from relying on trial testimony to support his argument that the evidence should have been suppressed. *See Medrano–Quiroz v. United States,* 705 A.2d 642, 648 (D.C.1997) ("We have also held that

## VI. Other Issues Raised in Appellant's Pro Se Briefs

■ Appellant raises several other arguments in his *pro se* briefs that we address only summarily. He claims that his Second Amendment rights were violated when he was found guilty of possession of a firearm by a convicted felon. The short answer to that claim is that the Supreme Court has "made it clear in [*District of Columbia v.*] *Heller* [554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) ] that [its] holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons[.]' " *McDonald v. City of Chicago,* — U.S. ——, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010).

■ Appellant also contends that the trial court did not have subject matter jurisdiction because he was arrested by federal authorities on federal property. We reject this argument, as the Superior Court has jurisdiction over cases involving violations of the D.C.Code, and the criminal provisions of the D.C.Code apply to all property owned by the United States in the District of Columbia unless such property is expressly exempted from coverage by Congress. *Cf. McEachin v. United States,* 432 A.2d 1212, 1216 (D.C.1981) (citing cases recognizing the Superior Court's jurisdiction over cases involving District of Columbia Code offenses committed on the grounds of federally owned property such as the Veterans Administration Hospital, the United States Capitol, and the White House).

■ Further, appellant asserts that the trial court violated his Sixth Amend-ment right to compulsory process "by [denying him] several witnesses relevant to his defen[s]e." However, "[t]he Compulsory Process Clause is not violated each time a defendant is deprived of a witness's testimony, but only when the witness's testimony would have been 'favorable and material' and 'not merely cumulative[.]' " *Harris v. United States,* 834 A.2d 106, 124 (D.C. 2003) (quoting *Bardoff v. United States,* 628 A.2d 86, 92–93 (D.C.1993)). Appellant has not shown how the testimony of any witness he was precluded from calling (including USCP spokesperson Kimberly Schneider) would have been based on personal knowledge as well as both favorable and material to his defense.

■ Appellant's argument that he was unlawfully "extradited" to a federal prison to serve his sentence is without merit. *See* D.C.Code § 24–101 (2001) (persons convicted of felonies in the D.C. Superior Court become the responsibility of the federal Bureau of Prisons ("BOP")). We likewise deny relief on his claim that the BOP has not properly given him credit for time served. *See Alston v. United States,* 590 A.2d 511, 514 (D.C.1991) (claims raised by prisoners held in federal prisons regarding credit for time served must be raised, by writ of habeas corpus, in the federal court in the jurisdiction where the claimant is confined). Also without support is appellant's claim that the search of his truck on February 8, 2008, was unlawful because it was pursuant to a D.C. Superior Court search warrant issued to federal law-enforcement authorities. Contrary to appellant's assertion, nothing in Fed.R.Crim.P. 41 supports his claim.

where the judge has denied a defendant's prayer for relief during an earlier stage of a trial, and where the circumstances have changed as the case has progressed, a defendant must renew his request on the basis of the changed circumstances in order to pre-serve for appeal any contention based on the record as modified."). As the government also argues, even if the title to the truck (which was found in the backpack) should have been suppressed, there was ample other evidence that tied appellant to the truck.

■ Appellant raises a number of claims about what he contends are errors in the pre-sentence report ("PSR") submitted to the trial court. Having declined to meet with the pre-sentence report writer, appellant is not entitled to complain about inaccuracies in the report with respect to his prior convictions or about the corresponding criminal history points that the writer calculated. In any event, from the materials in the record, we discern no basis for disturbing the trial court's determination that the PSR writer "satisf[actorily]" reported appellant's criminal history and point score.

■ Citing to § 6.2 of the D.C. Voluntary Sentencing Guidelines, appellant argues that all of his sentences should have been concurrent, with the possible exception of his sentence on the WMD count. However, the sentencing guidelines are purely voluntary. *See* D.C.Code § 3–105(a) (2001). Accordingly, we reject appellant's claim. *See Speaks v. United States,* 959 A.2d 712, 717–20 (D.C.2008) (explaining that a lawful sentence may not be appealed, whether or not it complies with the voluntary sentencing guidelines).

■ Finally, appellant's contention that law enforcement officers were derelict in their duties because they did not conduct an inventory search of appellant's truck when it was impounded is raised for the first time on appeal. We therefore need not consider the claim. We note, however, that (as appellant acknowledges) the jury heard testimony about the lack of inventory search, and thus the answer to appellant's belated claim is that this matter went to the weight, not to the admissibility, of the government's evidence about items found in the truck on February 8, 2008.

## VI. Conclusion

To summarize, we reject the various challenges brought by appellant with respect to his convictions, other than the challenge related to the trial court's failure to conduct a *Frendak* inquiry before proceeding to sentencing. We remand for a *Frendak* inquiry and for such further proceedings (possibly including re-sentencing) as the trial court determines are appropriate, consistent with this opinion. On remand, the trial court shall also vacate one of appellant's CDW convictions, his UA conviction for possession of the .45 caliber round, and all but one of his other UA convictions.

*So ordered.*